## THE PRESSED STEEL CAR COMPANY

*v.*

## JOHN R. HERATH, Admr.

*Opinion filed February 17, 1904.*

1. MASTER AND SERVANT—*when master is liable for injury to servant who obeyed command.* Where the servant is ordered by the master to work in a place known by both of them to be in a degree dangerous, the master will be liable for a resulting injury to the servant, unless the danger was so great that an ordinarily prudent person would have refused to obey the order, which is a question for the jury under the evidence.

2. VARIANCE—*objection of variance cannot be first raised on appeal.* An objection of a variance between the declaration and the proof cannot be raised for the first time on appeal.

*Pressed Steel Car Co.* v. *Herath,* 110 Ill. App. 596, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding.

WINSTON, PAYNE & STRAWN, (JOHN BARTON PAYNE, and RALPH M. SHAW, of counsel,) for appellant.

J. L. O'DONNELL, and BARR, BARR & BARR, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

A portion of the roof of a building belonging to the appellant which had been partially destroyed by fire, and which the appellee's intestate, Henry W. Smith, and other workmen of the appellant company, were engaged in removing, fell upon said Smith and instantly killed him. In an action on the case in the Will circuit court the appellee administrator was awarded judgment in the sum of $2000, on the ground the death of his intestate was attributable to actionable negligence on the part of a

vice-principal of the appellant company. The Appellate Court for the Second District affirmed the judgment on appeal, and the appellant company has perfected this its further appeal to this court.

At the close of all the evidence the appellant company moved the court to instruct the jury before whom the case was heard, to find the issues in its favor and return a verdict of not guilty. The court declined to grant the instruction, and such refusal constitutes the sole ground urged for reversal of the judgment.

The building was a large structure, three hundred and twenty feet long from east to west and eighty feet wide. It was covered with two gabled roofs running lengthwise with the building, supported in the center by iron columns each twenty feet apart. Large wooden trusses, shaped like an inverted V, the inner ends of which rested on the tops of the columns and the outer ends on the walls on either side of the building, rose to the apex of the roofs. The rafters extended lengthwise of the building from truss to truss, and at either end entered a mortice in the truss. They were covered with a sheeting of plank, on which was laid a roofing of corrugated iron. The framework of the roof was therefore in sections, extending from truss to truss, a distance of twenty feet, and from the outer wall to the valley in the center of the building. In the center of the building, at the eaves of the two roofs, there had been constructed a valley or gutter of galvanized iron two feet in width and six inches deep, into which the water from the inner slopes of each of the gable roofs was discharged. The building had been quite seriously damaged by fire, which burned away some of the rafters and in other respects so damaged the roofs that it was found necessary to tear them away in order that the building might be re-roofed. The work was performed by causing the sections of the roof between the trusses to fall to the floor of the building. On the 26th day of February, 1901,—the day when Henry W.

Smith, appellee's intestate, met his death,—the roof had
been taken down except three sections at the westerly
end of the building. Smith had not been engaged in the
work until the day he was killed. He began work about
seven o'clock in the morning and was killed at about the
hour of eleven o'clock in the same forenoon. He saw but
one section of the roof removed,—the third from the west
end. The section was caused to fall in the following
manner: A large, strong pole, called a "gin pole," was
raised from the floor to the apex of the truss, and the
truss was firmly lashed to this gin pole. Carpenters then
went upon the roof with axes and saws and cut or sawed
away the ends of the rafters which entered the mortices
in the easterly truss. The pressure of the ends of the
rafters and of the sheeting against the truss would still
probably support the easterly part of the roof. A block
and tackle were attached to the topmost point of the gin
pole above the apex of the roof, by means of which the
gin pole, and the truss which was lashed to it, could be
lifted upward and slightly away from the roof, thus re-
moving the support for the easterly end of the section of
the roof. Thereupon the east end of the section would
drop, and its weight would pull the remainder of the sec-
tion to the floor. The deceased saw the third section
removed in this manner and he assisted in clearing away
the debris from the floor. While he and his fellow-work-
men were engaged in clearing away the debris the gin
pole was erected and lashed to the easterly truss of the
second section of the roof, and carpenters were sent on
the top of the roof to cut and saw away the easterly ends
of the rafters of the second section of the roof. When
the sections of the roof fell, they usually brought with
them the portion of the iron guttering in the center of the
building to which the section was attached, but a consid-
erable portion of the guttering did not come down with
the third section, but remained only partially detached
from its original position. After the debris of the third

section had been removed, appellant's foreman caused a rope to be attached to this portion of the gutter, and ordered the workmen, including the appellee's intestate, to take hold of the rope and pull the guttering down. He placed these workmen with the rope so they would be east of and not under the second section of the roof and south of the guttering, but they were unable to pull away the guttering from that point, and he directed them to take the rope and go to the west and pull on it. This caused the workmen to pass under the second section of the roof, the easterly ends of the rafters of which had been cut away. When near the west door the foreman signaled the men to pull on the rope, and they did so two or three times, and while so engaged a portion of the easterly part of the second section of the roof came down and fell upon appellee's intestate and killed him.

The part of the roof which fell was some distance from the guttering which the workmen were attempting to pull down, and we find nothing in the testimony tending to show that this part of the roof was caused to fall by the efforts of the workmen to bring down the guttering. It was, we think, clearly shown that the foreman and the workmen, including appellee, understood that any section or part of a section might fall at any time after the points of the rafters had been sawed or cut away from the trusses, though it was the expectation of all that in order to bring down the section after the rafters had been cut away, it would be necessary to move the truss by means of the gin pole.

The contention of the appellant company is, that the falling of the roof, or parts of it, was one of the ordinary dangers incident to the work which the deceased had undertaken to perform; that the rule that it is the duty of the master to furnish the servant a reasonably safe place in which to work could not apply, because the work of demolishing the roof was inherently dangerous and made dangerous the place where the servants must

work, and the employee must, of necessity, assume the ordinary dangers incident to the undertaking in which he voluntarily engaged; that the deceased had full knowledge of all the dangers of the work, and that it should have been declared, as a matter of law, that his death was caused by a peril that was ordinarily incident to his employment and was assumed by the servant, and hence that the master could not be held liable in the action.

There is no direct proof that the deceased knew that the rafters of the second section had been cut or sawed away, but the work of cutting and sawing the rafters had been done in his sight and hearing, and it was proven that he had been for a time stationed at the proper point and ordered to keep workmen and other persons from going under the second section of the roof because there was danger it might fall. The foreman of the appellant company realized that the second section might fall at any time, the rafters, as he knew, having been cut away. We think the deceased had the same knowledge. But we think it equally clear that both the employer and the employee believed the section of the roof would remain in place until the truss should be moved so the roof would no longer be supported by it. Under these circumstances, and with the knowledge on the part of both employer and employee, the foreman ordered the employee and his fellow-workmen to go beneath the second section of the roof, and in obedience to the command of the master the deceased went into a place which he knew to be, in a degree, dangerous, and was killed. It is the primary duty of an employee to obey the commands of his employer. If ordered to perform an act which he knows is attended with danger, he is called upon to decide whether he will be justified in refusing to obey on the ground that the perils of obedience are too great. In this dilemma the law requires of him to act with that degree of prudence that would have controlled an ordinarily prudent, careful and discreet man.

The fear of losing employment will not justify him in rashly and recklessly exposing himself to known danger. An inconsiderate and improper order given by the master may constitute actionable negligence, and the master may not always be allowed to escape liability on the ground the servant should have disobeyed his order and not exposed himself to danger which attended compliance therewith. The principle is thus announced in *Chicago Anderson Pressed Brick Co.* v. *Sobkowiak,* 148 Ill. 573, (on p. 583): "Questions arise whether the action of a servant is his voluntary act, or done in obedience to the commands of the master or one in authority over him. When an act is performed by a servant in obedience to a command from one having authority to give it, and the performance of the act is attended with a degree of danger, yet in such case it is not requisite that such servant shall balance the degree of danger, and decide with absolute certainty whether he must do the act or refrain from it; and his knowledge of attendant danger will not defeat his right of recovery, if, in obeying the command, he acted with that degree of prudence that an ordinarily prudent man would have done under the circumstances." In *Illinois Steel Co.* v. *Schymanowski,* 162 Ill. 447, it was said (p. 459): "In the next place, a master is liable to a servant when he *orders* the latter to perform a dangerous work, unless the danger is so imminent that no man of ordinary prudence would incur it. Even if the servant has some knowledge of attendant danger, his right of recovery will not be defeated, if, in obeying the order, he acts with the degree of prudence which an ordinarily prudent man would exercise under the circumstances. * * * The master and servant are not altogether upon a footing of equality. The primary duty of the latter is obedience, and he cannot be charged with negligence in obeying an order of the master unless he acts recklessly in so obeying. Whether he acted thus recklessly in obeying his master's order or whether he acted as a reason-

ably prudent person should act are questions of fact to be determined by the jury."

The application of this principle to the conceded facts of the case correctly led the trial court to the conclusion that it could not be declared, as a matter of law, that the appellant company was not liable to respond in damages for the consequences which resulted from the order of its foreman, which was clearly inconsiderate and negligent. The deceased knew that in obeying the order and going beneath the second section of the roof he was exposing himself to a possible danger, but the order did not require him to remain under the section longer than was necessary to pass under it. The evidence tended to show that he knew that it was not likely the section of the roof would fall until the truss at the eastern end thereof had been moved by means of the tackle and pulley, which were attached to the gin pole for the express purpose of moving the truss and causing the sections to fall. It was therefore a question of fact for the determination of the jury whether the degree of known danger which attended compliance with the order of the representative of the appellant company was so great that an ordinarily prudent workman should have disobeyed the order.

It is urged there is no count in the declaration upon which, under the evidence, the appellee was entitled to recover. There was no demurrer to the declaration, and the insistence is that the judgment should be reversed because of a variance between the pleadings and the proof. The objection of a variance was not specifically raised in the trial court, where, if well taken, it could have been obviated by an amendment. It cannot be invoked in this court.

The judgment must be and is affirmed.

*Judgment affirmed.*